# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARKUS EVANS,**
      **Plaintiff,**

    **v.**                         **Case No. 17-CV-1133**

**ABIE DOUGLAS, *et al.*,**
      **Defendants.**

---

## DECISION AND ORDER

Plaintiff Markus Evans, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I screened the plaintiff's second amended complaint and allowed him to proceed on claims under the Fourteenth Amendment. The defendants move for summary judgment.

## I. BACKGROUND

### A.    Procedural Background

The plaintiff filed his complaint on January 30, 2017, in the U.S. District Court for the Western District of Wisconsin. ECF No. 1. On August 17, 2017, District Judge William M. Conley granted the plaintiff's motion to transfer his case to this district, and his case was assigned to Magistrate Judge William E. Duffin. ECF No. 12. Judge Duffin initially recommended that the plaintiff be ordered to submit an amended complaint after identifying the unknown defendants described in his complaint. ECF No. 17. Judge Duffin vacated that order after the plaintiff filed an amended complaint, which Judge Duffin screened, dismissed, and ordered the plaintiff to file a second amended complaint. ECF No. 22. The plaintiff filed a second amended complaint, ECF No. 23, which I screened on referral and permitted the plaintiff to proceed against several defendants. ECF No. 27.

The case was later reassigned to me, and I referred it to Judge Duffin for pretrial case management. ECF No. 33.

The plaintiff moved for leave to file a third amended complaint, in which he sought to add numerous defendants and allegations about events that occurred months earlier than the allegations in his second amended complaint. ECF No. 48. Judge Duffin granted the plaintiff's motion and recommended dismissing certain defendants. ECF Nos. 52 & 54. I reconsidered Judge Duffin's decision, denied the plaintiff leave to file his third amended complaint, and concluded that the second amended complaint would remain the operative complaint. ECF No. 59.

**B.    Factual Background**[1]

The plaintiff was a pretrial detainee at the Milwaukee County Jail (Jail) from December 19, 2010, through January 23, 2012. ECF No. 81, ¶¶ 17–18. He sues Deputy Inspector Kevin Nyklewicz; Deputy Sheriff Sergeants Todd Dickau and James Novotny; Lieutenant Abie Douglas; and Corrections Officers Kenyon Kirksey, Calvin Smith, and Jieire Vance. *Id.*, ¶¶ 19, 21, 28, 33, 36, 39, & 44. Nyklewicz oversaw day-to-day operations at the Jail. *Id.*, ¶ 20. Dickau supervised the Correctional Emergency Response Team (CERT) and generally oversaw entire floors of the Jail, but he rarely was assigned

---

[1] Facts in this section are taken from the defendants' proposed findings of fact and declarations in support of their motion for summary judgment, ECF Nos. 81, 83–92; the plaintiff's response to the defendants' facts, additional facts, and his declaration and documents in support, ECF No. 105–06; and the defendants' response to the plaintiff's facts, ECF No. 111. I will consider the proposed facts only to the extent they are supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii). Any facts not properly contested will be considered admitted. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). I will consider arguments in the supporting memorandum only to the extent they properly refer to the statement of facts. *See* Civil L. R. 56(b)(6).

to the Special Needs Unit where the plaintiff was confined in 2011. *Id.*, ¶¶ 22–23, 26. Smith also was a CERT lead rarely assigned to the Special Needs Unit. *Id.*, ¶¶ 39–40. Novotny was generally in charge of entire floors but sometimes responded to an officer need at the Special Needs Unit. *Id.*, ¶¶ 29–30. Douglas was assigned to floors of the Jail, but Kirksey was often assigned specifically to the Special Needs Unit. *Id.*, ¶¶ 34, 37. Vance was routinely assigned to the Jail's disciplinary unit but was not assigned to the Special Needs Unit during the relevant time period alleged in the second amended complaint. *Id.*, ¶ 45.

The second amended complaint details allegedly inhumane conditions the plaintiff was forced to endure from March 28 to May 30, 2011. ECF No. 27 at 3. The plaintiff states that on March 28, 2011, he engaged in a physical altercation with Douglas, Dickau, and Kirksey, after which the defendants cut off the plaintiff's clothes and left him on a restraint bed for four hours. *Id.* The plaintiff states that after removing him from the restraint bed, the defendants left him naked and handcuffed in his cell without hygiene products or access to a shower. *Id.* at 3–4. He states that his cell was covered in urine and feces, and he was allowed only brief uses of water to drink or flush his toilet. *Id.* at 4. The plaintiff asserts that Nyklewicz, Kyle Cummings, and other unnamed Deputy Inspectors approved improper use of the handcuffs, which cut his wrists and for which the plaintiff needed treatment at a "local E.R." *Id.* The plaintiff further stated that Douglas, Dickau, Kirksey, Novotny, Vance, and Smith did not allow him to make phone calls, have visitors, or exercise outside of his cell. *Id.* at 4. I allowed the plaintiff to proceed on claims of

3

excessive force and unconstitutional conditions of confinement against Douglas, Dickau, Kirksey, Nyklewicz, Cummings,[2] Novotny, Vance, and Smith. *Id.* at 7.

On July 31, 2019, the defendants moved for leave to file an oversized memorandum and statement of proposed findings of fact in support of their motion for summary judgment. ECF No. 65. I granted that request. The defendants' filings are expansive, including a 94-page brief and 486 proposed factual findings. ECF Nos. 81 & 82. Many of those statements of proposed facts detail events that occurred before and after the relevant March 28 through May 30, 2011 time period. ECF No. 81, ¶¶ 72–208, 427–454. I previously instructed the plaintiff that he may limit his response to the defendants' proposed findings of fact to those paragraphs that discuss material facts and that he "may, but need not," respond to any other paragraph or may file a general denial to facts he deemed immaterial. ECF No. 97 at 7. I will discuss the facts related to dates outside of the relevant time period as background and for comprehension of the events that occurred from March 28 through May 30, 2011.

### 1. The Special Needs Unit

The Special Needs Unit houses inmates on suicide watch or who have physical- or mental-health conditions requiring close medical attention, often for their own safety.

---

[2] Kyle Cummings was later dismissed as a defendant and replaced by "John Cummings," whom Judge Duffin dismissed as a defendant in the plaintiff's proposed third amended complaint. ECF Nos. 43, 45 & 54. Because I disallowed the plaintiff to proceed on his third amended complaint, and Kyle Cummings was never a proper party in this action, the plaintiff is not proceeding against either Cummings defendant. Also listed as a defendant is "Kyle Nyklewica," which it appears is a misspelling of Nyklewicz. I will dismiss this defendant, who does not exist.

4

ECF No. 81, ¶ 49. Inmates on "restraint watch"[3] are kept in a restraint belt for their own safety, which makes it difficult for them to reach their knees but still possible for inmates to use the bathroom. *Id.*, ¶ 52.[4] Inmates are placed in a t-shirt, toeless socks, and pants for medical reasons before being placed on the restraint bed. ECF No. 81, ¶ 65. The defendants state that inmates are not left naked and usually are not placed in a suicide gown, but if a suicide gown is used the inmate can change clothes before being placed on the restraint bed. *Id.* Nonetheless, there is at least one picture in the record of the plaintiff on a restraint bed while wearing a suicide gown. ECF No. 85-2 at 6. Neither restraints nor physical force may be used as punishment. ECF No. 111, ¶ 488.

Inmates on maximum custody status are further restricted when their behavior requires it. ECF No. 81, ¶ 66. At least two officers are assigned to the Unit and conduct inspections every fifteen minutes for inmates on suicide or restraint watch. *Id.*, ¶ 50. Medical personnel also check restraint-watch inmates every few hours to ensure the restraints are not too tight and that the inmate is not attempting self-harm. *Id.*, ¶ 51. Inmate workers clean cells in the Special Needs Unit weekly and respond to biohazardous incidents for cleaning on an as-needed basis. *Id.*, ¶¶ 59, 68. These workers clean cells when an inmate is transferred out of the Unit, after emergencies, or even if a toilet overflows. *Id.*, ¶ 70.

---

[3] The defendants concede there is no official policy called "restraint watch," but they state inmates may be supervised for placement in restraints on a case-by-case basis. ECF No. 111, ¶ 487.

[4] The plaintiff states that the restraint belt made it difficult or impossible to "urin[ate] properly" or wipe himself after using the toilet. ECF No. 105-1, ¶ 497; ECF No. 106, ¶ 95.

Inmates in the Special Needs Unit receive one hour of time outside their cells each day to shower, make phone calls, read, or otherwise spend leisure time. ECF No. 81, ¶ 53. Inmates on disciplinary status may not receive this hour of recreation time for safety or disciplinary reasons. *Id.*, ¶ 54. Inmates in the Unit not on a restricted status receive a mattress, sheet, and blanket for sleeping and various hygiene products including only a partial roll of toilet paper to prevent inmates from flooding toilets and sinks or covering cell windows. *Id.*, ¶¶ 56–57. Writing utensils are given only out of cells and are not permitted to inmates within their cells. *Id.*, ¶ 58.

Occasionally it is necessary to shut off the water to the Special Needs Unit, but it may be manually restored to a certain cell to allow a courtesy toilet flush or drink of water. ECF No. 81, ¶¶ 60–61. The defendants followed this practice or instructed staff to follow it to encourage the inmate to "to commit to his or her safety and commit to the security and safety of the facility" before the water would be permanently restored. *Id.*, ¶¶ 61–62.

## 2. The Plaintiff's History in the Special Needs Unit

The plaintiff had over 160 encounters with medical staff while incarcerated at the Jail. ECF No. 81, ¶ 71. He was immediately placed in the Special Needs Unit and on maximum-custody status when he arrived because of his violent past and violent fantasies he harbored. *Id.*, ¶ 72. He had numerous incidents involving unsafe, unsanitary, and/or dangerous behavior between December 25, 2010 and March 25, 2011. *Id.*, ¶¶ 74–208. Among these are multiple incidents of the plaintiff covering his cell window with objects or feces, *id.*, ¶¶ 75, 79–80, 82, 85; urinating out of his cell, *id.*, ¶¶ 74, 86, 89, 98–99, 103–04, 134, 146, 181, 184–85, 189, 192, 194–97; or clogging his toilet with objects, causing Jail staff temporarily to shut off the water, *id.*, ¶¶ 87, 108–09, 125, 131, 147. Jail

6

staff attempted to allow him water to drink and use the toilet even when they had shut it off for safety purposes. *Id.*, ¶¶ 108, 120, 131–32, 143, 147, 149–51.

Force was used because of the plaintiff's non-compliance with orders or assault to Jail staff on four occasions. ECF No. 81, ¶¶ 84, 172, 180, 204. Nyklewicz signed off on each of these as objectively reasonable and in compliance with department policy. *Id.*, ¶¶ 84, 172, 180, 204. Medical staff responded to see or treat the plaintiff on numerous occasions, *id.*, ¶¶ 86, 107, 109, 111, 120, 124, 133–34, 140, 154, 170, 179, 184, 203, 205. Jail staff believed the plaintiff's histrionic behavior may have been malingering or exaggerated based on a note he sent to another inmate asking how to "fake being crazy," *Id.*, ¶¶ 157–58. The plaintiff disputes that an inmate told officials that he inquired how to feign mental illness. ECF No. 106, ¶¶ 6, 11.

### 3. March 28, 2011

From March 25 to 28, 2011, the plaintiff was housed at Froedtert Hospital to address a necrotic abscess that had formed on his lower right leg after the plaintiff rubbed feces into wounds on his leg. ECF No. 81, ¶ 207–08. He returned to the Jail on March 28, 2011, and was taken to the Special Medical Unit (SMU). *Id.*, ¶ 209. The plaintiff's medical records show he had bandages on both of his knees, which needed to be changed because he had urinated on himself. *Id.*, ¶ 222. Nyklewicz ordered the plaintiff be placed on restraint watch, and Dickau implemented wellness checks on the plaintiff every fifteen minutes. *Id.*, ¶¶ 210–12, 223; ECF No. 84-2 at 15. Nyklewicz ordered that, given the plaintiff's history, all medical treatment of the plaintiff involve two officers and one supervisor and that he be kept in restraints. ECF No. 81, ¶ 214; ECF No. 84-2 at 27.

7

The plaintiff disputes he was placed in restraints for his own safety. ECF No. 106, ¶ 14. He states that he did not intentionally infect his own wounds by rubbing feces in them, but they became infected on their own over time because his cell was covered in urine and feces that would get onto the bandages and his wounds. *Id.*, ¶¶ 20, 95. During his deposition the plaintiff testified that he did not remove his leg dressings, but they would come off as "the tape would get kind of wore down." ECF No. 91-2 at 39:15–22. Yet he also testified that he sometimes removed his bandages when they became old and stained. *Id.* at 53:23–54:14. The plaintiff states, and the defendants do not dispute, that when the plaintiff returned to the Jail on March 28, 2011, no staff members asked him to comply with safety rules and not smear feces into his wounds to prevent further infection. *Id.*, ¶ 94; ECF No. 111, ¶ 522.

During the March 28, 2011 incident, Kirksey, Dickau, and Douglas put the plaintiff in the restraints based on Nyklewicz's order. ECF No. 81, ¶ 215. Those defendants, with assistance from other officers (who are not defendants), escorted the plaintiff to his cell in the Special Needs Unit. *Id.* According to the plaintiff's medical records and Jail logs, the plaintiff was not placed in a restraint bed that day, though he was on restraint watch. *Id.*, ¶ 216. Kirksey and Dickau do not recall any issues during this encounter, and there is no Incident Report in the Jail log documenting any issue. *Id.*, ¶ 217. Nor do the defendants recall whether the plaintiff was dressed in Jail-issued clothing or a suicide gown, but they state he would not have been left naked because he was in restraints. *Id.*, ¶ 220.

The plaintiff disputes the defendants' version and states that he was handcuffed to the restraint bed before Dickau, Kirksey, Douglas, and Smith took him to the Special

Needs Unit. ECF No. 106, ¶ 14.[5] He states both that the defendants attempted to, and did, leave him nude and in restraints in his cell without a mattress, sheets, hygiene items, or books but left a suicide gown on the cell bed. *Id.*, ¶¶ 14, 93. He testified to the same during his deposition. ECF No. 91-2 at 25:18–26:5, 30:15–17, 30:25–31:6, 46:13–15, 46:19–21, 73:17–20, 103:8–9. He asserts that he ran at the defendants out of anger, and the defendants slammed his leg in the cell door. ECF No. 106, ¶ 14. He states this is what caused the injuries on his leg but that it occurred *after* he returned from the hospital. *Id.*, ¶ 97. During his deposition, however, he testified that he could not remember how or when he was injured and remembered only that his "legs were slammed in the door during cell extraction after I was handcuffed and put in my cell." ECF No. 91-2 at 24:20–24. Medical personnel then determined that he needed to go to the hospital for treatment. *Id.* at 24:25–25:3.

The defendants state the restraints were meant to keep the plaintiff from reaching and removing the bandages on his leg wounds. ECF No. 81, ¶ 212. Late in the night of March 28, 2011, however, the plaintiff removed the bandages on his knees and rubbed his feces-stained hand in his wound, risking infection. *Id.*, ¶¶ 222, 224. New bandages were applied just after midnight on March 29, 2011, and medical personnel instructed him not to remove his bandages or risk severe infection. *Id.*, ¶ 226. The plaintiff remained on restraint watch until April 7, 2011. ECF No. 81, ¶ 225. The plaintiff disputes these statements and asserts that he was incapable of reaching and removing the bandages while restrained. ECF No. 106, ¶¶ 18–19, 95–96. Yet during his deposition, the plaintiff

---

[5] In his second amended complaint, the plaintiff did not allege that Smith was involved in the March 28, 2011 incident.

testified the restraints made it "difficult" but not impossible to remove the bandages. *Id.*, ¶ 213; ECF No. 91-2 at 115:16–17. The plaintiff asserts he was left in restraints, not just on restraint watch, until June 3, 2011. ECF No. 106, ¶ 96; ECF No. 91-2 at 30:18–20.

### 4. March 29 to 31, 2011

In the morning on March 29, 2011, a nurse cleaned the plaintiff and provided him breakfast. ECF No. 81, ¶ 227. The nurse noted that the plaintiff was wearing a "quilted tunic" that was stained with feces and urine, had red marks around his handcuffed wrists, and requested food because he had slept through breakfast and told the nurse "All I been eating is dooky." *Id.* Although the plaintiff appeared more lucid later that morning, in the evening Kirksey, Dickau, and Douglas returned him to the SMU so he could be cleaned again. *Id.*, ¶¶ 228–29. The defendants do not recall any issues during this encounter, and there is no Incident Report about it. *Id.*, ¶ 230. The plaintiff disputes the nurse's account and states that he was naked and hungry because Jail staff passed him up during breakfast, and he insists that his "mental illness reasoned him to eat feces to survive." ECF No. 106, ¶ 21. The plaintiff states, and the defendants dispute, that Jail staff failed or declined to provide him meals on numerous occasions. ECF No. 111, ¶ 510. He testified that some officers did not like him and would refuse to provide him meals. ECF No. 91-2 at 32:19–33:8. He objects to the defendants' assertion that a lack of an Incident Report means no incident occurred on a certain date. ECF No. 106, ¶¶ 22–23.

The defendants do not recall any issues during encounters with the plaintiff on March 30, 2011. ECF No. 81, ¶¶ 231–39. Despite being on restraint watch, the plaintiff was approved for a special visit with his mother, to which Vance, Novotny, and others

escorted him without issue. ECF No. 84-4 at 52. The plaintiff does not dispute that there were no issues this day. ECF No. 105-1, ¶¶ 233–39.

On March 31, 2011, Jail staff observed the plaintiff "picking at his bandages," so nursing staff changed them. ECF No. 81, ¶ 243. A nurse noted that the plaintiff's wounds were healing well, but he was kept in restraints because he had previously smeared feces into his infected wounds. *Id.*, ¶ 244. The plaintiff remained in a suicide gown, though he was no longer on suicide watch, and security was directed to check on him every fifteen minutes. *Id.*, ¶ 245. The plaintiff objects to the statement that he was picking at his bandages, disputes that he ever smeared feces into his wounds, and states he was unaware of any treatment plan in place. ECF No. 106, ¶¶ 25–27.

**5. April 2011**

The defendants detail the plaintiff's treatment in early April 2011, which included frequent changing of his bandages and other medical treatment, cleaning him after he handled his own feces, and changing a diaper he was forced to wear. ECF No. 81, ¶ 246–54. The plaintiff "objects" to certain immaterial facts, including what he was wearing and whether he intentionally removed his bandages and diaper. ECF No. 106, ¶¶ 28–30.

From April 4 to 7, 2011, medical staff observed the plaintiff exhibiting bizarre behavior. ECF No. 81, ¶¶ 255–67. Medical staff continued to change his bandages to help his wounds heal and created a plan of action to restrain him without causing injury to his wrists from handcuffs. *Id.*, ¶ 263. On April 5, 2011, the plaintiff's family visit was canceled after he was observed licking and attempting to eat the particle board in the visiting booth. *Id.*, ¶ 262. The plaintiff's mother visited him on April 7, 2011. *Id.*, ¶ 264. The same day, Nyklewicz removed the plaintiff from restraint watch after he agreed to behave,

eat food (rather than his feces), and not injure himself. *Id.*, ¶ 267. Nyklewicz informed the plaintiff he would go back on restraint watch if he continued to remove his bandages or smear feces or urine on them or his wounds. *Id.* The plaintiff agreed to comply. *Id.* The plaintiff disputes having this conversation with Nyklewicz or any Jail staff. ECF No. 106, ¶ 35. At his deposition he testified that he was never taken off restraint watch and remained restrained for several more weeks. ECF No. 91-2 at 42:12–43:9. He testified that wearing restraints for an extended period of time cut into his wrists, for which he was given bandages but no meaningful medical treatment. *Id.* at 41:19–42:7. He again disputes he ever intentionally infected his wounds with feces. ECF No. 106, ¶ 34.

Over the next few days, the plaintiff was observed several times masturbating and/or eating or smearing his feces on himself or his cell. ECF No. 81, ¶¶ 268–77. Medical staff continued to clean him and his cell, replace his bandages, and provide a clean cell and water. *Id.* On one occasion, his water was shut off because he repeatedly flushed his toilet. *Id.*, ¶ 268. The plaintiff disputes that incident and disputes eating his feces on at least one occasion. ECF No. 106, ¶¶ 36–37. Yet, as noted, he swore in his declaration and testified at his deposition that he sometimes ate his feces because he was hungry after Jail staff refused to provide him meals. *Id.*, ¶ 21; ECF No. 91-2 at 32:19–33:1.

On April 11, 2011, the plaintiff met with a psychiatrist, who questioned why the plaintiff had been removed from restraint watch. ECF No. 81, ¶ 278. The psychiatrist learned that Nyklewicz had removed the plaintiff from restraint watch because he was eating and not contaminating his wounds. *Id.* Very early the next morning, the plaintiff twice removed his suicide gown and slid it under his cell door; one time the gown was

filled with feces. *Id.*, ¶¶ 281–82. The biohazard team cleaned the inside and outside of the cell that morning and again later after the plaintiff urinated out of his cell. *Id.*, ¶¶ 283, 285. That night, the plaintiff placed his suicide gown in the toilet before attempting to slide it underneath his cell door and covered his cell door with his mattress. *Id.*, ¶ 286. The plaintiff insists that Jail staff took his gown and refused to give him another, so he urinated on his cell door "out of frustration and anger." ECF No. 106, ¶¶ 40–41. He testified that he did not have a mattress at the time, and any records stating that he did are "fabricated." ECF No. 91-2 at 45:4–12.

On April 13, 2011, a sergeant (who is not a defendant) ordered the plaintiff removed from his cell after throwing feces through his food chute and placing it around the locking mechanism of his cell. ECF No. 81, ¶¶ 290–91. Dickau responded with the CERT team, who removed the plaintiff from his cell, stabilized him against a wall, and restrained him with zip-ties and a restraint belt. *Id.*, ¶¶ 292–93. The plaintiff later attempted to bite an officer's hand, and the officer responded with a "focused strike" to the plaintiff's jaw meant to stop the assault without causing injury. *Id.*, ¶¶ 294–95. The officer completed a Use of Force report about the incident, which noted that the plaintiff had been placed back on restraint watch. *Id.*, ¶¶ 296–97. After the plaintiff again urinated out of his cell, he was placed on a restraint bed because of his "violent and biohazard behavior that put himself and others at risk." *Id.*, ¶ 298. A psychiatrist spoke with the plaintiff later that evening, and the plaintiff screamed, "I want to get out!" *Id.*, ¶ 300. He was given two shots of Haldol, removed from the restraint bed but left in restraints, and returned to the Special Needs Unit. *Id.*, ¶¶ 300–02. He remained on restraint watch until April 25, 2011. *Id.*, ¶ 302.

13

The plaintiff disputes he had strength to kick open the food chute of his cell, states that he never threw feces from his food chute, and asserts that he was assaulted by the officer without provocation. ECF No. 106, ¶¶ 43–45. He insists he never attempted to bite the officer, who used the false report as a pretext to place the plaintiff on restraint watch. *Id.*, ¶ 46. The plaintiff states he did not agree to the Haldol injection and asserts he remained on restraint watch until June 3, 2011. *Id.*, ¶¶ 48–49. He contests Nyklewicz's approval of the Incident Report about the use of force, for which he states Nyklewicz did not speak with him or investigate the incident. *Id.*, ¶ 51.

During the next several days, the plaintiff continued to manipulate his leg bandages and interfere with his wounds' healing. ECF No. 81, ¶¶ 305–21. Medical staff continued to monitor his behavior, change his bandages, and offer him food or Ensure as a meal replacement. *Id.* On April 16, 2011, the plaintiff was observed placing feces on his cell floor and licking it, and a non-defendant captain at the Jail cancelled the plaintiff's family visit. *Id.*, ¶ 309 (citing ECF No. 84-2 at 35). On April 19, 2011, the plaintiff damaged video equipment being used for a video conference in his state criminal case. *Id.*, ¶ 317. Nyklewicz ordered that two officers and a supervisor with a taser restrain the plaintiff using six-point restraints, a wheelchair, and leg irons for any housing changes or future court visits. *Id.*, ¶ 318; ECF No. 85-3. On April 21, 2011, medical staff was notified that the plaintiff's wound was bleeding from him "picking at it and digging into it." ECF No. 81, ¶ 324. Medical staff stated the dressing needed to be changed only if the plaintiff bled through the gauze or smeared feces into his wound. *Id.* The plaintiff disputes that he had manipulated his bandages or picked at his leg wound. ECF No. 106, ¶¶ 52–59. He also

testified that he was provided medical treatment only "[e]very once in a while . . . every blue moon" when his dressings needed to be changed. ECF No. 91-2 at 40:1–18.

From April 23 through 25, 2011, the plaintiff was observed consuming his own urine and feces on several occasions. ECF No. 81, ¶¶ 325–29. He also screamed profanities at a correctional officer who had woken him and claimed that he had not eaten anything all day. *Id.*, ¶¶ 329–30. This behavior continued for the remainder of the month, during which he attempted to remove his restraint belt, refused to remove his hands from his food chute, and repeatedly banged his head against a wall. *Id.*, ¶¶ 335, 337–339. On April 26, 2011, he was placed back into a restraint bed because of the threat to himself. *Id.*, ¶ 339; ECF No. 84-2 at 16. Medical staff assessed him several times before removing him from the bed at 10:30pm that night. ECF No. 81, ¶¶ 340–41. The plaintiff states he consumed his own waste because he was thirsty and hungry and asserts the correctional officer who woke him did so for no reason. ECF No. 106, ¶¶ 60–61. He states that the restraint bed was an unreasonable solution to him banging his head against the wall. *Id.*, ¶ 65. During his deposition he reiterated that he consumed his own urine because he was thirsty, and his water had been turned off. ECF No. 91-2 at 53:7–20. He testified that some officers would not allow him water because of his behavior while at the Jail, but he did not name those officers. ECF No. 91-2 at 64:14–20.

After a court appearance on April 28, 2011, the state court concluded that the plaintiff was competent to proceed in his case and ordered proceedings to commence. ECF No. 81, ¶ 358. Jail officials returned the plaintiff to the Jail and attempted to change his clothes to a suicide gown, but the plaintiff became resistive and attempted to assault the officers. *Id.*, ¶ 347. A deputy (who is not a defendant) kicked the plaintiff in self-

defense after the plaintiff charged at him. *Id.*, ¶ 348. The plaintiff lodged his leg into the cell door jam, preventing officers from locking it, and the deputy twice struck the plaintiff in his thigh to remove his leg from the cell door and allow officers to close it. *Id.*, ¶ 349. The plaintiff remained in a restraint belt but later told a nurse "that he was doing fine," and the nurse medically cleared him. *Id.*, ¶¶ 350–51. The plaintiff objects to parts of this incident but cites no evidence in support of his objections. ECF No. 105-1, ¶¶ 347–52.

Later the same day, the plaintiff removed his bandages and tied them around his neck like a necktie. ECF No. 81, ¶ 354. He was again placed on a restraint bed and on suicide watch for his own safety. *Id.*, ¶ 355. Medical staff administered another Haldol shot and removed him from the restraint bed early the next morning, but he remained on restraint watch until June 3, 2011. *Id.*, ¶¶ 356–57. The plaintiff contests that he was able to remove his bandages and tie them around his neck while in the restraint belt. ECF No. 106, ¶¶ 68–69.

On April 30, 2011, the plaintiff refused to have his bandages changed and smeared feces all over himself and his suicide gown. ECF No. 81, ¶ 360. He was again placed on a restraint bed for three hours while medical staff changed his bandages and cleaned his body. *Id.* The plaintiff again appeared smeared with feces later that night, and he was again placed on the restraint bed so medical staff could wash him and his clothes and change his bandages. *Id.*, ¶ 361. Medical staff found a feces-covered lump of toilet paper in his mouth and provided him a meal-replacement shake with antibiotics crushed into it for his safety. *Id.* The plaintiff reiterates that it was physically impossible for him to smear feces on his body while in the restraint belt. ECF No. 106, ¶ 70. He does not otherwise contest the defendant's description of this incident.

### 6. May 2011

The plaintiff's behavior continued into May 2011. ECF No. 81, ¶¶ 362–65. On May 1, 2011, he masturbated into a foam cup instead of returning it to the nurse. *Id.*, ¶ 362. On May 2, 2011, medical officials wrote orders for three medications to be given the plaintiff "at the first evidence of wild at-risk behavior to manage and enhance safety." *Id.*, ¶ 365. The same day, Douglas assisted correctional officers with changing the plaintiff's bandages, without incident. *Id.*, ¶¶ 366–67. Early the next day, the plaintiff coated his suicide gown in feces, smeared feces on his wall and in his sink, and licked his wall. *Id.*, ¶ 370. Staff changed his bandages and cleaned his cell within a few hours. *Id.*, ¶ 371. The plaintiff's bandages were changed without incident, although not without his protests, over the next several days. *Id.*, ¶¶ 372–75, 378–82. The plaintiff does not dispute these events. He insists his masturbating into a cup was "a natural act" and should not constitute a mental illness or reason to be restrained. ECF No. 106, ¶ 71. He asserts that, while providing the plaintiff a towel, Douglas told the plaintiff "to h[a]ng himself with it." *Id.*, ¶ 73.

On May 9, 2011, while his suicide gown and cell were replaced or cleaned because they were covered in fecal matter, the plaintiff charged his cell door and injured a corrections officer. ECF No. 81, ¶ 385. Five correctional officers and a lieutenant later readied the plaintiff for court and warned him with a taser "of the consequences of agitated behavior in court." *Id.*, ¶ 386. He was twice taken to court in a wheelchair and stun belt pursuant to the standing order from Nyklewicz. *Id.*, ¶ 387. While returning from court the second time, the plaintiff became combative and erratic and threatened to kill Jail staff and himself. *Id.*, ¶¶ 387–88, 390. Back at the Jail, Douglas, Dickau, and two other

lieutenants (who are not defendants) placed him on the restraint bed where he remained for approximately four hours. *Id.*, ¶ 388; ECF No. 84-2 at 17. The plaintiff was given injections to calm him and checked on several times through the afternoon and evening. ECF No. 81, ¶ 390. That night, the plaintiff was seen eating his feces and spitting at his window during inspections. *Id.*, ¶ 391. The plaintiff disputes that an officer was injured when he charged his cell door or that he threatened to kill himself or others. ECF No. 106, ¶¶ 74–75. He objects to, but does not otherwise properly dispute, the defendants' account of events on May 9, 2011.

Also on May 9, 2011, the state court in the plaintiff's criminal case denied his appeal of the court's competency order and reaffirmed that the plaintiff was competent to proceed in his case. ECF No. 81, ¶ 389. The plaintiff continued exhibiting unusual behavior and receiving bandage changes and medical care without significant incident, although he often refused his medications. ECF No. 81, ¶¶ 392–95, 397–420. He remained on maximum custody status because of his frequent behavior issues. *Id.*, ¶ 396. During a visit from his mother on May 15, 2011, however, staff noted that the plaintiff was acting "somewhat normal." *Id.*, ¶ 405. He had another family visit on May 24, 2011. *Id.*, ¶ 419. On May 28, 2011, a psychiatrist assessed the plaintiff and noted his "quite normal behavior and appearance." *Id.*, ¶ 422. He opined the plaintiff's gradual change in behavior could be due to medications or could be a sign that the plaintiff "has stopped trying to convince us he is [mentally incompetent]" since the state court's conclusion. *Id.* The remainder of May 2011 occurred without significant incident. *Id.*, ¶¶ 423–26. The plaintiff disputes the psychiatrist's evaluation and asserts he was biased by his belief that the plaintiff "was malingering and faking mental illness to try to avoid getting convicted on a

homicide charge." ECF No. 106, ¶ 88. He objects to the defendants' statement that he acted "somewhat normal" during the visit from his mother. *Id.*, ¶ 80.

### 7. June 2011 through January 2012

On June 1, 2011, the plaintiff appeared in court without incident, as were the next two days at the Jail. ECF No. 81, ¶¶ 427–29. On June 25, 2011, the psychiatrist again noted that the plaintiff's "unusual behavior" had decreased since the state court had determined he was competent to proceed in his case. *Id.*, ¶ 436. He opined that the plaintiff no longer needed to be housed in the Special Needs Unit. *Id.* On June 29, 2011, the plaintiff was moved out of the Special Needs Unit but remained on maximum custody status until January 2012. *Id.*, ¶ 439. The defendants submitted a calendar showing the plaintiff was in restraints from March 28 through April 7, 2011; from April 13 through April 25, 2011; and finally from April 28 through June 3, 2011. ECF No. 92-1 at 4–7.

The plaintiff faced little if any discipline through October 2011 and was "generally cooperative with Jail rules." *Id.*, ¶ 440. On September 28, 2011, Nyklewicz adjusted the plaintiff's status to allow his transport by only one officer. *Id.*, ¶ 441. On October 3, 2011, the plaintiff refused to lockdown or wear his restraints, which eventually led to disciplinary confinement. *Id.*, ¶¶ 442, 444–47. He had other disciplinary incidents from November 2011 until January 20, 2012, when he was transferred to a state prison following his state court conviction and sentence to life without parole. *Id.*, ¶¶ 448–54.

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material

facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## A. Fourteenth Amendment Claims

I allowed the plaintiff to proceed on two claims against the defendants: 1) that Nyklewicz directed Dickau, Kirksey, Douglas, and Smith to use excessive force when they restrained him on March 28, 2011, and 2) that all defendants subjected the plaintiff to unconstitutional conditions of confinement from March 28 to May 30, 2011. Because the plaintiff was a pretrial detainee at the time of the alleged events, I review his claims under the Due Process Clause of the Fourteenth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

### 1. Excessive Force

The Due Process Clause "'protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The Court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, including

what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Under an objective reasonableness inquiry, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted). The proper application of this standard requires consideration of the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. This list is not exhaustive but illustrates some of the "objective circumstances potentially relevant to a determination of excessive force." *Id.*

The defendants state that there were no issues restraining the plaintiff on March 28, 2011, and no incident report was filed. The plaintiff insists that the defendants threatened to spray him with a chemical agent, took him to the Special Needs Unit, removed his clothing, and left him naked on a restraint bed. The plaintiff stated in his second amended complaint that he and the defendants engaged in a "physical altercation," but he does not detail the force used in that altercation or state whether any defendant sprayed him, struck him, or otherwise handled him in an improper and excessive manner. He concedes he was being disruptive and aggressive, so some level of force was necessary for the safety of Jail staff and the plaintiff. His only evidence of force is his testimony that unnamed staff "slammed [him] into the wall." ECF No. 91-2 at 39:4–14. But he does not clarify which defendants (if any) were responsible or assert that it was unnecessary given his resistance and aggression at the time.

21

Even accepting the plaintiff's version of March 28, 2011 as true, he does not provide evidence that any defendant used *unnecessary* force on him beyond that needed to transfer him to the Special Needs Unit and restrain him. The evidence shows that the level of force used was necessary to handle an aggressive and difficult inmate.[6] Because no reasonable jury could conclude that the defendants used excessive force while detaining and restraining the plaintiff on March 28, 2011, the defendants are entitled to judgment as a matter of law on this claim.[7]

### 2. Conditions of Confinement

For the plaintiff to proceed on his conditions of confinement claim, the evidence must show that the conditions were objectively unreasonable; that is, he must show that the conditions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 822 (citing *Kingsley*, 576 U.S. at 397). The plaintiff also must show that that the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). It is not enough to show they acted with negligence or even gross negligence. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018)). The court must "focus on the totality of facts and circumstances" that the

---

[6] The plaintiff also testified about a March 23, 2011 incident, during which Smith punched him once or twice and an unspecified "Mexican dude . . . landed at least four punches." ECF No. 91-2 at 77:1–6, 77:18–78:15. He testified that he was "fighting back" against the officers and charged out of his cell at them. *Id.* at 76:21–25. The plaintiff did not provide this level of detail about the March 28, 2011 incident on which his legal claim is based.

[7] Whether it violated the plaintiff's rights to leave him naked and in restraints relates to his claim challenging the conditions of his confinement, not whether excessive force was used on March 28, 2011. I will address that issue with his conditions of confinement claim.

defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams*, 937 F.3d at 942.

It is undisputed that the plaintiff frequently exhibited bizarre behavior over the two months discussed in his second amended complaint. The defendants contend that the plaintiff was given proper medical care and restrained only as appropriate for his own safety and the safety of others. The plaintiff disputes his treatment was appropriate and disputes in his sworn declaration many of the defendants' characterizations of him and the conditions in which he was kept. Many of these disputes are immaterial, e.g. the type of suicide gown the plaintiff was given, whether he smeared or ate his feces on a certain date. Other disputes are material, including whether Nyklewicz ordered Dickau, Kirksey, Douglas, and Smith to leave the plaintiff naked and in restraints on March 28, 2011; whether he was left in restraints, or only on restraint watch or suicide watch, between March 28 and June 3, 2011; whether he consumed his own waste to feign mental illness or because the defendants did not provide him adequate water or food; and whether he was provided frequent, daily medical treatment and observation or only very occasional medical treatment during the two-month period.

The bulk of the evidence shows that the defendants and other Jail staff were tasked with handling an extraordinarily difficult and dangerous inmate. They placed him on restraint watch or in restraints for his safety or the safety of others, not as punishment. He was given family visits, even while on restraint watch, when feasible. He was given prompt medical treatment frequently, often daily, and most of these treatments and cleanings were without incident. The plaintiff's water was shut off only when he was misusing his cell's toilet or sink, and he was offered temporary water use to flush his toilet

23

or drink water until he agreed to comply with Jail rules and appropriately use his cell's plumbing. Although the plaintiff often was found in his own excrement, it was the product of his own actions and may have been a ploy to be deemed incompetent in his state court criminal matter. This evidence does not show that the plaintiff was mistreated, kept in inhumane conditions, arbitrarily denied water for extended periods of time, or kept on the restraint bed unnecessarily or without clothing or a suicide gown.

Nonetheless, there is some evidence to support the plaintiff's claims. The plaintiff's sworn declaration details the mistreatment he received, the harsh conditions he faced, and how the defendants were responsible. The declaration states that the plaintiff certifies under penalty of perjury that it is true and correct, and it cites to 28 U.S.C. § 1746. ECF No. 106 at 14. "[A] declaration under § 1746 is equivalent to an affidavit for the purposes of summary judgment." *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011). A party opposing summary judgment may use an affidavit or declaration to do so

> only if the affidavit (1) attests to facts of which the affiant has "personal knowledge"; (2) "set[s] out facts that would be admissible in evidence"; and (3) "show[s] that the affiant or declarant is competent to testify on the matters stated." . . . Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains.

*James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (citation omitted).

The plaintiff's version of events strains credulity. It does not square with the Jail logs, the plaintiff's medical evidence, or the statements provided by the defendants. Parts of his declaration contradict itself, his responses to the defendant's proposed findings of fact, and even his deposition testimony. The defendants assert that I need not find a genuine dispute of fact based on the plaintiff's declaration because his medical records

and Jail logs contradict many of his assertions. ECF No. 110 at 4. They insist that I should not accept the facts as detailed in his declaration, and not deny their motion based on the declaration, because "no reasonable jury could believe it." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007).

But "district courts presiding over summary judgment proceedings may not 'weigh conflicting evidence,' [*In re*] *High Fructose Corn Syrup* [*Antitrust Litig.*,] 295 F.3d [651], 655 [7th Cir. 2006], or make credibility determinations, *see Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) . . . ." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). The plaintiff's declaration attests to facts of which the plaintiff would have personal knowledge—what happened at the Jail and how he was treated from March 28 to May 30, 2011. It sets out facts that would be admissible in evidence— the plaintiff's version of events. And it shows that the plaintiff is competent to testify to the matters stated—he was there and observed what happened with his own eyes. And as noted, I must view all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party, which is the plaintiff.

Despite some inconsistencies, the plaintiff's deposition testimony also largely follows his sworn declaration. Although the plaintiff could not remember every date or name, he testified that Kirksey, Smith, Douglas, and other officers placed him on the restraint bed and later left him naked and handcuffed in his cell. He testified that the defendants left him restrained in his cell without mail, hygiene products, or consistent water use for two months. He testified that these defendants provided him a suicide gown that he was unable to don while wearing restraints. He testified both that his leg bandages fell off when they became old and that he sometimes removed them himself because they

were falling off and stained. He testified that he was provided only infrequent and brief medical treatment, usually when his dressings needed to be changed. He testified that wearing restraints for an extended period of time cut into his wrists, which were bandaged but not treated. He testified that he consumed his own waste at times because he was hungry or thirsty, and Jail staff did not give him food or water because they disliked him and/or did not want to deal with him. This testimony bolsters both his second amended complaint and his declaration submitted in opposition to summary judgment.

Not all these measures violated the plaintiff's constitutional rights. It was not inherently punishment to restrain the plaintiff when he was violent or a danger to himself or others. Nor was it unconstitutional to limit the plaintiff's food or water when he was openly refusing to drink or eat and instead misusing the water and food to dirty himself or his cell. *See Bell v. Wolfish*, 441 U.S. 520, 540 (1979). But it would not be reasonable to leave the plaintiff in restraints without a break for two months. *See May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000) ("The use of bodily restraints constitutes punishment in the constitutional sense if . . . they appear excessive in relation to the purpose they allegedly serve."). It would not be reasonable to provide the plaintiff only infrequent medical treatment for his leg wounds and psychiatric issues or to deny him mail, hygiene items, or water for an extended period. *See Jones v. Thompson*, 818 F. Supp. 1263, 1268 (S.D. Ind. 1993) (noting that extended use of three-way restraints, "coupled with the absence of medical review or treatment and the denial of even basic amenities such as personal hygiene and toilet usage, was not reasonably related to a legitimate goal or interest of the Jail"). It would be similarly difficult to discern a legitimate governmental interest in leaving the plaintiff in his cell naked and in restraints. *See Butler v. Meyers*, No. 10-C-653, 2010

26

W 4338091, at *4–5 (E.D. Wis. Oct. 22, 2010) (citing *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)) (noting that leaving pretrial detainee naked and in restraints for one week could constitute a constitutional violation).

Given the conflicting evidence on these issues, a jury must determine whether Nyklewicz, Dickau, Kirksey, Douglas, and Smith subjected the plaintiff to unconstitutional conditions of confinement. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665–66 (7th Cir. 2012) (citing *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006), and *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992)). These defendants are not entitled to summary judgment as a matter of law.

The plaintiff's evidence does not implicate every defendant. He provides no evidence, not even in his sworn declaration, of Novotny or Vance's personal involvement. He does not state that Novotny was involved in the March 28, 2011 incident or was responsible for the inhumane conditions. He states that Vance, along with other defendants, believed the plaintiff was faking his mental illness. ECF No. 106, ¶ 10. He also testified that Vance "was present" during some of his mistreatment and "usually in a booth." ECF No. 91-2 at 108:16–22. But he does not show that Vance should be held liable for the purported conditions. Because the plaintiff has provided no evidence that either of these defendants was involved in the March 28, 2011 incident or responsible for the conditions of the plaintiff's confinement, a reasonable jury could not find them liable for violating his rights. Novotny and Vance are entitled to judgment as a matter of law.

## B. Qualified Immunity

The defendants assert that they are entitled to qualified immunity on the plaintiff's Fourteenth Amendment claims. Qualified immunity "protects government officials from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted)). Qualified immunity is an affirmative defense. Once raised, the plaintiff must show that the defendants violated his constitutional rights and that the right at issue was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232. The law is "clearly established" only if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Figgs*, 829 F.3d at 905 (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001)) (internal quotation marks omitted). "The clearly established law must be 'particularized" to the facts of the case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is not necessary that there be cases "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted).

It was clearly established as early as 1979 that Jail staff may not punish pretrial detainees by subjecting them to harsh or unnecessarily restrictive conditions, including the use of body restraints, without a legitimate, nonpunitive justification. *See Bell*, 441 U.S. 561; *May*, 226 F.3d at 884. The plaintiff provided evidence that he was unreasonably restrained and kept in unnecessarily harsh conditions for two months without a legitimate, nonpunitive purpose. The defendants are not entitled to qualified immunity on the plaintiff's claim about the conditions of his confinement.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 80) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** for Kyle Cummings, James Novotny, and Jieire Vance and for all defendants on the plaintiff's claim of excessive force. The motion is **DENIED** for Kevin Nyklewicz, Abie Douglas, Todd Dickau, Kenyon Kirksey, and Calvin Smith on the plaintiff's claim regarding the conditions of his confinement.

**IT IS FURTHER ORDERED** that Kyle Cummings, Kevin Nyklewica, James Novotny, and Jieire Vance are **DISMISSED**.

The court will schedule a telephonic status conference to discuss the next steps with the remaining parties on the plaintiff's conditions of confinement claim.

Dated in Milwaukee, Wisconsin, this 24th day of August, 2020.


s/Lynn Adelman
LYNN ADELMAN
United States District Judge

Case 2:17-cv-01133-LA   Filed 08/24/20   Page 29 of 29   Document 114